IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| MICHAEL P. SCHRIKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | |
| CITY OF HOPE (INC.), | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES

NOW COMES Plaintiff Michael P. Schriks and, pursuant to Fed.R.Civ.P. 8(a), files this Complaint against Defendant City of Hope (Inc.) seeking recovery of damages and other appropriate relief for employment discrimination, showing the Court as follows:

### INTRODUCTION

1.

On August 11, 2025, Michael Schriks, who is Caucasian, was terminated from his job as *Director of Strategic Operations* at City of Hope (Inc.) for a dubious and pretextual reason purportedly based on a brief interaction with a co-worker that happened some three months prior.

2.

A high-performing employee for nearly twenty years with City of Hope and Cancer Treatment Centers of America, which was acquired by COH in 2022, Schriks' termination

for "unprofessional behavior" was in fact part of a series of personnel decisions that were motivated by race as part of City of Hope's "DEI mission to infuse DEI into our DNA."

3.

A desire to demonstrate "progress" towards its DEI mission has caused City of Hope's CEO Jonathan Watkins and other leaders who are African American to emphasize skin-deep factors like race rather than diversity of *thought* in personnel decisions.

4.

Federal employment discrimination law does not allow racial balancing efforts under a "DEI" banner. Instead, the law promotes decision-making focused on merit rather than on things like race or color. Discrimination is discrimination regardless of the race or color of the victim.

5.

Plaintiff brings this action for monetary damages and other appropriate relief based upon Defendant's violation of Plaintiff's rights as protected by the Civil Rights Act of 1866, 42 U.S.C. § 1981.

**PARTIES, JURISDICTION, AND VENUE**

6.

The United States District Court for the Northern District of Georgia, Newnan Division, has subject matter jurisdiction over this action, which presents federal claims. Further, the amount in controversy exceeds $75,000. Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343(a), 2201 and 2202.

7.

Plaintiff is a U.S. citizen, was employed by Defendant in Georgia, and at all times relevant hereto, has been a resident of the State of Georgia.  Plaintiff is subject to the jurisdiction of this Court for purposes of this action.

8.

Defendant is a foreign corporation which operates a business within the Newnan Division of the Northern District of the State of Georgia, located at 600 Celebrate Life Parkway, Newnan, Georgia, 30265.  Defendant at all relevant times has transacted business in Georgia, employed Georgia residents, and derived substantial revenue from patients and customers in Georgia.

9.

Defendant is subject to the jurisdiction of this court.

10.

Defendant is an "Employer" engaged in an industry affecting commerce as defined by 42 U.S.C. § 2000e(b), 29 U.S.C. § 630(b), and 29 U.S.C. § 203(d) and at all relevant times has employed thousands of employs.

11.

At all times relevant hereto, Plaintiff worked at Defendant's Newnan, Georgia facility – City of Hope Atlanta.

12.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. §2000e as Defendant does business in this district and division, and all or substantially all of the

the events giving rise to Plaintiff's Complaint occurred in this district and division.

13.

Defendant may be served with process by serving a copy of the Summons and Complaint on Defendant's Registered Agent, C T Corporation System, 289 South Culver Street, Lawrenceville, Georgia 30046.

14.

In accordance with Fed.R.Civ.P. 4, Defendant may also be served with process by delivering a copy of the Summons and Complaint to an officer or managing or general agent of Defendant.

**FACTS**

15.

According to its website, Defendant City of Hope (Inc.) ("COH") is one of the largest cancer research and treatment organizations in the United States.

16.

COH has over 10,0000 employees and operates five "Cancer Centers" and more than 30 outpatient clinical facilities in California, Georgia, Illinois, and Arizona.

17.

COH has at all relevant times been the recipient of Federal funds, including grants from the National Institutes of Health (NIH).

18.

COH acquired Cancer Treatment Centers of America ("CTCA") in 2022 for a reported $390 million.  As a consequence of this acquisition and a rebranding effort, the

former CTCA oncology hospitals and outpatient care centers were re-named. Thus, the CTCA facility in Newnan, Georgia became City of Hope Atlanta ("COH-Atlanta").

19.

Plaintiff Michael Schriks ("Schriks") is a Caucasian male and a former employee of COH.

20.

For almost twenty years, Schriks was a high-performing employee for CTCA and COH.

21.

Schriks has most recently served as *Director of Strategy and Operations* at COH-Atlanta. Prior to that, he served (at CTCA) as *Vice President of Operations* for seven years, *Assistant Vice President General Services* for four years, and *Director of General Services* for five years.

22.

In his formal performance evaluations, Schriks has never received an evaluation less than "meets expectations."

23.

Schriks' direct supervisor at COH from August, 2024 until Schriks' termination was Patrick Brown, *Vice President of Business Development*.

24.

The event which COH has used to justify Schriks' termination for "unprofessional behavior" involved a brief interaction between Schriks and an Environmental Services

("EVS") employee named Pattie Neal which occurred on May 15, 2025.

25.

This interaction occurred as Schriks was attempting to ensure that the retail corridor on the first floor at COH-Atlanta was as clean as possible in the moments before COH's Board of Directors walked through the corridor as part of an elaborately planned tour they were taking. This was part of a national board meeting being hosted by COH-Atlanta, which Schriks was intimately involved in the planning and execution of.

26.

Nothing about Schriks' behavior on May 15 would have motivated most employers to terminate his employment.

27.

Upon information and belief, the person with whom Schriks was interacting, Ms. Neal, did not herself make a complaint to HR about Schriks.

28.

It was not until *two months* later, apparently, that anyone discussed with HR Schriks' interaction with Ms. Neal on May 15.

29.

Almost *three months* after the subject interaction, Schriks was terminated.

30.

Schriks was given a "Memorandum" when he was terminated.

31.

The Memorandum stated that Schriks was being terminated for "unprofessional

6

behavior and inappropriate actions."  No particular behavior or action was identified.

32.

The Memorandum purported to be "from" Schriks' direct supervisor Patrick Brown. But Brown was not the author of the Memorandum.

33.

Nor was Brown, who is Caucasian, involved in the actual decision to fire Schriks.

34.

The exclusion of the direct supervisor in this way was out of the ordinary in terms of how employee terminations are handled at COH; and indeed, atypical of the way decision-making works at most places of employment.

35.

In Schriks' case, decision-making was controlled and/or influenced by COH's *President and CEO* Jonathan Watkins and *HR Director* Jamie L. Wigginton (a self-described "Change Agent and Culture Enthusiast"), both of whom are African American.

36.

A co-worker of Schriks observed HR employees looking for a reason to fire Schriks.

37.

Multiple employees expressed to Schriks disagreement with the manner and circumstances of his termination and the events leading up to his termination.

38.

No form of lesser or progressive discipline was used before Schriks received the

*death penalty* of adverse actions for conduct that, even as incorrectly characterized by HR, would not ordinarily have resulted in a termination.

39.

By comparison, in 2025 (only a few months ago), Nakeyta Bridges, an African-American employee at COH who has worked in the guest services area at COH-Atlanta, made a highly inappropriate comment about a mostly white civic group visiting the Newnan facility – "are we hosting a KKK meeting?" – which was reported to her supervisor, Kalemah Woolfolk, who is also African American, and to others. And yet, Bridges was retained as an employee.

40.

Likewise, Angie Ferrell, an African-American employee working at COH-Atlanta as a social worker, has for a period of years made offensive comments to patients and other employees (some of whom have refused to work with her) that are well known to COH-Atlanta management, yet Ferrell has been retained as an employee.

41.

In Schriks' case, had he been African American, he would not have been terminated.

42.

The two senior-most employees who reported to Schriks, Ricky Ayres (Security & Transportation) and Bill Reilly (Facilities), are now reporting to A.J. Brooks.

### The "Culture of DEI" at City of Hope

43.

George Floyd's death in 2021 triggered an increased interest in corporate America

in DEI initiatives in the employment arena.

44.

According to Debra Fields, COH's *Executive Vice President and Chief Transformation Officer*, City of Hope is "committed to deepening our culture of diversity, equity, and inclusion in the workplace."

45.

To further this "deepening," COH employed Angela Talton as its *System Senior Vice President and Chief DEI Officer*.

46.

Talton self-describes her role as "lead[ing] the development of a sustainable vision and strategy for advancing diversity, equity, and inclusion (DEI) and ensuring measurable accountability and commitment…"

47.

Talton "established a DEI strategy and strategic implementation roadmap" at COH.

48.

Talton created at City of Hope "situational inclusivity training" focused on "enabling" employees to "build awareness of the need for inclusion at work" and "demonstrate[ing] the actions and behaviors needed to create an inclusive work environment."

49.

According to Talton, "continuous" DEI training is integral to "cultural transformation."

50.

Two of the tools implemented by Talton and COH were the creation of "an accountability infrastructure" and the use of "diversity scorecards."

51.

In 2022, COH launched an employee referral program which monetarily incentivizes employees to recruit "diverse" candidates for employment to advance the goal of a more "diverse" workforce.

52.

On January 27, 2023, Talton and *System Chief Human Resource Officer* Joline Treanor announced, via an internal email, the broadening of COH's definition of "underrepresented groups" and financial incentives to employees to refer and recruit individuals from "underrepresented groups" for employment at COH.

53.

In that communication, Talton and Treanor refer to the need to ensure that "we infuse DEI into our DNA."

54.

"Infusing DEI into our DNA" has been and is an operative theme and slogan at COH.

55.

That phrase has been central to COH's "Diversity Week" celebrations.

56.

On May 17, 2024, COH issued and/or authorized a press release celebrating its

10

fourth consecutive year as a "Top Hospital and Health System for Diversity, Equity and Inclusion."

57.

The press release credits "Situational Inclusivity Learning" modules and online classes for employees at COH which focus on "changing actions and behaviors to be more consciously inclusive."

58.

The press release also extols COH's "rigorous evaluation of new hire metrics, human capital management, inclusive onboarding practices, [and] diverse candidate slate requirements."

59.

DEI policies, procedures, and practices at COH promote the *prioritization* of race, color, and ethnicity in decisions affecting workforce demographics.  This comes at the expense of decision-making focused on job qualifications *without regard* to race.

### *The Influence of Race on Personnel Decisions at City of Hope*

60.

A number of high-level personnel decisions made by CEO Jonathan Watkins within the past five years at CTCA and COH were motivated or influenced by race.

61.

After COH's acquisition of CTCA, Jonathan Watkins continued as CEO of COH.

62.

In early 2020, while Watkins was President and CEO at CTCA, efforts were

11

underway to screen applicants for an open *VP of Business Development* position at COH-Atlanta.

63.

At the time, Plaintiff Schriks was Vice President of Operations in Atlanta and a member of the Executive Team along with Anna Simelane, Dr. Patricia Rich, Dr. Alan Yahanda, Ray Williams, Andrew Caldwell, and Dr. Gary Bernstein.

64.

The Executive Team recommended to Watkins, the final decision-maker, that an employee who is Caucasian, Todd Goodall, be hired as *VPBD* based on his experience.

65.

Watkins, however, wanted to fill the position with an African American person who had less experience; and he did.

66.

Watkins was also a (or the) decision-maker in filling an open *COO* position in 2020.

67.

The acting/interim COO at the time was Marsha Suber, a Caucasian employee who understood from two prior CEOs that she was being groomed for COO as part of the company's succession plan.

68.

Suber was not even interviewed for the permanent position. The candidates who were interviewed were all African American. John Baldwin, a 29-year-old African-

American person whom Watkins intended to hire even before the position was posted, was given the offer and installed as *COO*.

69.

Suber was better qualified than Baldwin to be COO – she had more experience, more relevant experience, had been promoted five times from 2014 to 2020 based on her performance, and had been successfully performing as interim COO.

70.

The pre-selection of Baldwin and the manner in which Watkins brought him in as *COO* deviated from normal hiring practices.

71.

Suber ultimately filed civil claims against Jonathan Watkins and CTCA alleging race discrimination.

72.

Baldwin had poor leadership skills and departed employment at COH in January, 2022 after some eighteen months.  Watkins replaced Baldwin as COO with Trevor Brand, also African American, and in his mid-30s.

73.

Brand left COH after approximately two years and AJ Brooks, also African American, became the next COO at COH.  This move, in March of 2025, was Brooks' first employment in an executive role.

74.

Baldwin, Brand, and Brooks were all hand-picked by Watkins.

13

75.

Qualified Caucasian employees had expressed interest in the COO role at each juncture, but Watkins preferred African American candidates each time.

76.

In 2020, Watkins pressured Gary Bernstein, a Caucasian physician who was CTCA's Chief of Surgery, to step down and replaced Bernstein with Anita Johnson, an African American.

77.

Other Caucasian surgeons were replaced by African American or non-Caucasian surgeons while Watkins was a decision-maker at CTCA.

78.

In 2022, Watkins hired African American physician Dr. Chukwuemeka Obiora into a surgical oncologist position even though at the time, Dr. Kevin Watkins and Dr. Catherine Poruk, Caucasian physicians, were sufficiently handling the existing surgical oncology patients.

79.

According to Dr. Kevin Watkins, Dr. Obiora's surgeries were excessively long and he had poor outcomes.  Dr. Watkins raised concerns about Dr. Obiora's surgical outcomes to Jonathan Watkins.

80.

After being abruptly terminated in August, 2022, Dr. Watkins filed civil claims against Jonathan Watkins and City of Hope (Inc.) alleging race discrimination; and that

14

Jonathan Watkins and COH "preferred nonwhites over whites in employment,… promotion[s], work assignments, [ ] and decisions to terminate."

81.

Also in 2022, Watkins demoted Schriks from *VP of Operations* to *Director of Operations* and removed Schriks from the Executive Team.

82.

At or near the same time, Watkins promoted Kalemah Woolfolk, who is African American, and to whom Schriks would then report, into a newly created Executive Team role – *Vice President Patient Service*.

83.

Woolfolk told Schriks in their first meeting that she didn't know why she had been promoted into the new role and knew little about operations.

84.

Race has affected and motivated multiple personnel decisions made or influenced by Jonathan Watkins, including while at COH.

85.

Schriks would not have been terminated had he been African-American.

86.

The reasons used by COH to attempt to explain Schriks' termination are pretextual.

87.

As the direct result of COH's actions in violation of Federal laws which prohibit employment discrimination, Schriks has suffered damages and harm, both economic and

15

non-economic, and he will likely continue to suffer damages and harm into the future as a result of the actions at issue.

88.

The economic impact of the subject termination on Schriks is substantial.  Schriks has suffered and will continue to suffer lost salary, lost bonuses, lost stipends, and other monetary losses.

89.

Schriks has also suffered and will suffer pain and suffering and emotional distress as a result of his termination and the violation of his civil rights.

90.

COH's actions in connection with Schriks' termination, and those of its executive leaders, were carried out with knowledge of and with reckless disregard for Schriks' federally protected rights.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

91.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

92.

But for his race, Schriks would not have been terminated.

93.

COH's termination of Schriks was in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

94.

COH's violation of § 1981 was committed intentionally.

95.

Defendant's unlawful discrimination has caused Plaintiff to suffer both monetary and non-monetary damages and losses.

96.

Schriks is entitled to an award which compensates and makes him whole for: lost back pay including lost base salary, lost bonus(es), and lost incentive payouts; lost salary, bonuses, and stipends in the future (front pay); other economic damages; the intangible harm to Schriks as a result of the violation of his civil rights and his loss of employment, including emotional harm and pain and suffering; attorney's fees; costs; and all other appropriate damages, compensatory damages, remedies, and relief available under § 1981 and all Federal statutes providing remedies for violations of § 1981.

## COUNT II
## PUNITIVE DAMAGES

97.

The actions of COH, detailed above, were taken and approved by high-level leaders and executives of COH.

98.

These executives and leaders knew that employment decisions are unlawful when based on race.

99.

The actions of Defendant and its agents complained of herein evidence willful misconduct and demonstrate willful or reckless indifference to and disregard of Plaintiff's Federally protected rights, so as to make appropriate the imposition of punitive damages on the Defendant.

100.

Punitive damages should be awarded in an amount sufficient to deter COH from repeating the unlawful actions it took with respect to Plaintiff.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, upon the trial of this action, Plaintiff prays that this Court:

A.    Enter judgment in Plaintiff's favor against the Defendant for the violation of Plaintiff's rights under § 1981;

B.    Award Plaintiff full back pay and economic damages (past, present and future) in lieu of reinstatement, including reasonable front pay, in such amount(s) as will reasonably compensate Plaintiff for these losses, to be determined at the trial of this case;

C.    Award Plaintiff all compensatory damages recognized by § 1981, including damages for emotional distress and pain and suffering occasioned by the

violation of Plaintiff's civil rights, in such amount as will reasonably compensate Plaintiff for these losses, to be determined at the trial of this case;

D.      Award Plaintiff punitive damages in an amount to be determined at the trial of this case;

E.      Award Plaintiff the costs of this action, including reasonable attorney's fees and expenses;

F.      Award Plaintiff interest on the Judgment at the statutory rate;

G.      Grant such additional relief, including equitable relief, as the Court deems proper and just.

Respectfully submitted this 16th day of January, 2026.

**MOORMAN PIESCHEL, LLC**

/s/ *Christopher G. Moorman*
Christopher G. Moorman
Georgia Bar No. 521490
*Attorney for Plaintiff*

1819 Peachtree Road, NE
Suite 406
Atlanta, Georgia 30309
Telephone: (404) 898-1242
cgm@moormanpieschel.com

19